Tina Wolfson, SBN 174806
twolfson@ahdootwolfson.com
Alex R. Straus, SBN 321366
astraus@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: 310-474-9111; Fax: 310-474-8585

*Counsel for Plaintiff, Austin Dickey,
individually and on behalf of all others
similarly situated*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN DICKEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TICKETMASTER, LLC, a Virginia Corporation; LIVE NATION ENTERTAINMENT, INC., a Delaware Corporation,<br>Defendants. | Case No. 18-cv-9052<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff AUSTIN DICKEY brings this action on behalf of herself and all others similarly situated against TICKETMASTER L.L.C. and LIVE NATION ENTERTAINMENT, INC. (collectively, "Defendants"). Plaintiff's general allegations against Defendants are based upon information and belief and upon investigation by counsel for Plaintiff. Allegations specifically pertaining to Plaintiff are based upon her personal knowledge.

## I.    INTRODUCTION

1.    Defendant Live Nation Entertainment, Inc. ("Live Nation") is the largest live entertainment company in the world, boasting revenue of $10.4 billion

in 2017, $1.8 billion in cash, and $3.2 billion in total assets as of December 31, 2017.[1]  The CEO of Live Nation, Michael Rapino ("Rapino"), made $70.6 million in compensation during 2017.[2]  Defendant Ticketmaster, Inc. ("Ticketmaster") is a wholly owned subsidiary of Live Nation and claims to be the world's largest ticket marketplace with more than 500 million annual ticket sales.[3]

2.     Ticketmaster's business model is premised on the myriad fees charged on each ticket sold, including: (1) a facility charge; (2) a convenience charge; (3) an order processing fee; (4) a ticket printing fee; and (5) a faculty fee.  In total, the additional fees charged by Ticketmaster are typically $17.30 on a $30 ticket.[4]  This amounts to a 57% increase on the price of every ticket, the overwhelming majority of which goes directly to Ticketmaster and/or Live Nation.

3.     The CEO of Live Nation, Rapino, described the fees Ticketmaster charges on each ticket as "not defendable" in internal emails the company fought in court to keep secret.[5]

4.     Ticketmaster provides a platform to sells tickets to at face value, plus its various fees and charges, to the public ("primary ticket marketplace"). Ticketmaster also provides platforms for those tickets to be resold, with additional fees and charges, in what Ticketmaster deceptively describes as fan-to-fan transactions ("secondary ticket marketplace").

5.     In many instances Ticketmaster also takes a percentage of the original face values price "for its services" from the artists.  It is a phenomenally profitable business because all these fees are lawfully charged to Ticketmaster's customers.

---

[1] https://www.billboard.com/articles/business/8221386/live-nation-104-billion-record-revenue-2017-q4-earnings-drop-report
[2] https://newrepublic.com/article/148419/ticket-monopoly-worse-ever-thanks-obama
[3] https://business.ticketmaster.com/our-story/
[4] http://latimesblogs.latimes.com/music_blog/2010/08/ticketmaster-a-new-era-of-transperancy-or-smoke-mirrors-.html
[5] *Id.*

6.      In addition to the exorbitant lawful fees Ticketmaster charges for each ticket sold, Defendants have concocted an elaborate and unlawful scheme to dramatically increase their profits at the direct financial and emotional expense of their customers.

7.      In September 2018, the Toronto Star published a scathing exposé based on undercover investigations by its reporters which revealed that Ticketmaster is intentionally undermining is own business purpose in order to reap huge profits reselling the same tickets on its secondary ticket market.

8.      First, Ticketmaster enables professional ticket re-sellers ("scalpers" or "ticket resellers") to purchase large quantities of face value tickets before individual fans can access those tickets, using fictitious accounts and/or bypassing Ticketmaster's per-person ticket purchasing limits.  Then, in order to facilitate the re-selling of its tickets by scalpers on its secondary ticket marketplace, Ticketmaster created a web-based inventory-management system so those scalpers can upload large quantities of tickets purchased from Ticketmaster and immediately list them again for resale on Ticketmaster's secondary marketplace where Ticketmaster often profits even more than it did on the original sale. Next, Ticketmaster created a multi-tiered scalper rewards program with financial incentives to reach $500,000 or $1 million in annual sales, bonuses for increasing year-to-year sales, and other financial incentives to violate California law and unjustly enrich Ticketmaster.  Lastly, Ticketmaster has established one of the largest secondary ticket marketplaces in order to reap huge profits when the scalpers it supplies, encourages, and incentivizes sell real fans event tickets at enormous increases over the face value ticket price, plus all of Ticketmaster's fees on both the original primary ticket market purchase as well as the fees Ticketmaster charges on the secondary ticket marketplace sales.

## II.    **PARTIES**

8.      Plaintiff Austin Dickey is a resident of San Diego, California. Plaintiff

purchased tickets, originally sold by Ticketmaster, on the secondary market, specifically at www.ticketmaster.com/verified.

9.    Ticketmaster L.L.C., is a Virginia corporation headquartered in Beverly Hills, California.  Ticketmaster is the live-event ticket sales and distribution subsidiary of Live Nation Entertainment, Inc.

10.    Live Nation Entertainment, Inc., is a Delaware corporation headquartered in Beverly Hills, California.

## III.    JURISDICTION AND VENUE

11.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the Class includes members who are citizens of a different state than defendant.

12.    This Court has personal jurisdiction over Defendants because their principal places of business are located in California.

13.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants sell tickets throughout the State of California, including in this judicial district.

## IV.    FACTUAL ALLEGATIONS

14.    The reselling of tickets is a $5 billion industry in the United States.

15.    Ticketmaster, the world's largest primary market ticket seller, is also one of the biggest players in the secondary ticket marketplace.

16.    Ticketmaster operates at least three secondary ticket marketplace platforms: (1) Ticketmaster.com/verified; (2) Ticketexchangebyticketmaster.com; and (3) Ticketsnow.com.

17.    Ticketmaster has every financial incentive to sell tickets to people who will resell those tickets on Ticketmaster's secondary exchange, as opposed to selling each ticket one time to a fan who intends to use that ticket to experience a concert of other live event.

18.     Ticketmaster more than doubles its profits if the same ticket can be sold twice; once from Ticketmaster on its primary ticket marketplace, with an estimated 57% markup in fees, and again from Ticketmaster on its secondary marketplace, where the markup is often higher.

19.     For many events sold through Ticketmaster, the terms of purchase limit resale to Ticketmaster's own resale exchanges.

20.     Ticketmaster's primary ticket marketplace explicitly represents to its customers and the public that it: (1) "specifically prohibits re-sellers from purchasing tickets that exceed the posted ticket limit for an event;" and (2) "prohibits the creation of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale."

21.     However, according to a recent Toronto Star and Canadian Broadcasting Corporation investigation, Ticketmaster specifically aided resellers purchasing tickets in excess of the posted ticket limit and facilitated the use of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale.[6]

22.     Ticketmaster also created TradeDesk, a custom-designed and web-based inventory management, and point-of-sale system "built expressly for professional resellers" which allows scalpers to 'sync' hundreds of Ticketmaster.com accounts and instantly upload purchased event seats onto secondary ticket marketplace websites, including giving preferential treatment o professional resellers who sell tickets on Ticketmaster's secondary ticket marketplace platforms.[7]

---

[6]https://www.thestar.com/news/investigations/2018/09/19/we-went-undercover-as-ticket-scalpers-and-ticketmaster-offered-to-help-us-do-business.html; https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535
[7]https://www.documentcloud.org/documents/4901430-TMR-Professional-Reseller-Handbook-1-1.html ("Professional Reseller Handbook"), at 8.

23.     Ticketmaster also created "Transfer" which is a TradeDesk feature that lets scalpers move any verified Ticketmaster ticket from one account to another.[8]

24.     Upon information and belief, Ticketmaster provided automated programs to professional ticket resellers designed to help purchase tickets from Ticketmaster and immediately post those tickets to Ticketmaster's own secondary exchange for resale, evidencing Ticketmaster's use of its overwhelming primary ticket exchange market power to control the secondary ticket market as well.

25.     Ticketmaster anti-competitive practices leverage its primary ticket exchange power to manipulate the secondary ticket exchange by expediting the issuance of final tickets with bar codes when tickets purchased on Ticketmaster's primary exchange are offered for resale on Ticketmaster's secondary exchange, and offering a significantly slower process when tickets are offered for resale on any other exchange.

26.     Upon information and belief, Ticketmaster also punishes professional resellers who do not resell Ticketmaster's tickets on Ticketmaster's secondary exchange.  Ticketmaster is believed to selectively assert legal and contractual rights and claims against resellers who do not use Ticketmaster's reselling platforms in order to gain control of the secondary ticket market.

27.     In other words, Ticketmaster makes it extremely easy and efficient for professional resellers to integrate hundreds of Ticketmaster accounts for purchase and resale – but only if those resales are on Ticketmaster's secondary exchange.  If a professional reseller buying tickets from Ticketmaster sells those tickets on a non-Ticketmaster secondary exchange that reseller, upon information and belief, is far more likely to have the ticket limit rules enforced.  Ticketmaster's overwhelmingly dominant market share of the primary ticket exchange means that a sanction or banishment from Ticketmaster is disastrous for any professional

---

[8]*Id.*, p. 9.

reseller and this forces the reseller's interests to be directly in line with Ticketmaster's interests.  This selective enforcement is a powerful market manipulating tool powered by Ticketmaster's market power.

28.     Ticketmaster also incentivizes scalpers to purchase tickets in bulk through a series of rewards program with financial incentives, including a reduction in resell fees for $500,000 or $1 million in annual sales.  There are also bonuses for increasing year-to-year sales and other financial incentives.  The explicit representation to the public that Ticketmaster "prohibits re-sellers from purchasing tickets that exceed the posted ticket limit for an event" is contrary to the facts.

29.     According to the Toronto Star investigation, Ticketmaster representatives, unaware they were speaking to undercover reporters, admitted to knowing that scalpers have "literally a couple hundred accounts" in order to buy in bulk from Ticketmaster and that Ticketmaster was not concerned if professional re-sellers are using automated software and fake identities to circumvent ticket-buying limits.[9]

30.     Ticketmaster representatives also admitted that its secondary ticket marketplace platforms do not monitor or police users of its TradeDesk platform for conduct in violations of Ticketmaster policies.[10]  Ticketmaster representatives further admitted that Ticketmaster's primary and secondary ticket marketplace platforms do not communicate regarding abuses of Ticketmaster's primary ticket market platform which directly benefit Ticketmaster's secondary ticket marketplace platform: "We don't share reports, we don't share names, we don't share account information with the primary site. Period."[11]

31.     In other words, Ticketmaster knows that scalpers with hundreds of

---

[9] https://www.cbc.ca/news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535
[10] *Id.*
[11] *Id.*

ticket buying accounts – for the sole purpose of violating its policies – are using unlawful means to buy face value tickets from Ticketmaster and then using Ticketmaster's TradeDesk and Transfer tools to instantly re-sell those tickets on Ticketmaster's secondary ticket marketplace platforms at huge price increases to fans who did not use unlawful means and, thus, could not gain access to Ticketmaster's original face value primary ticket market.  Ticketmaster, meanwhile, is unlawfully profiting from both the primary and secondary ticket marketplace sales.

32.     On September 21, 2018, U.S. Senators Jerry Moran (R-Kan.) and Richard Blumenthal (D-Conn.) sent a letter to Live Nation's CEO regarding numerous allegations.  Specifically, the Senators' letter to Ticketmaster referenced reports that Ticketmaster:

> recruits and employs professional ticket scalpers to circumvent the ticket purchasing limits on its own primary ticket sales platform in an effort to expand its ticket resale division and utilizes a professional reseller program called TradeDesk, which provides a web-based inventory for scalpers to effectively purchase large quantities of tickets from Ticketmaster's primary ticket sales website and resell these tickets for higher prices on its own resale platform.

33.     The Senators' letter referred to allegations of "TradeDesk users moving up to several million tickets per year," such that the alleged "harms to consumers made in this piece are serious and deserve immediate attention.

34.     Based on the Senators' "ongoing interest in protecting consumers from unfair and deceptive practices" and concern that Ticketmaster may have violated the *Better Online Ticket Sales(BOTS) Act of 2016,* they requested responses to the following questions:

> a.  Describe the event ticket purchasing limits that Ticketmaster currently employs for sales on its primary ticket sales platform.

Additionally, how does the company identify computer programs used to circumvent these purchasing limits?

b. Do Ticketmaster's ticket purchasing limits and associated detection practices apply to users of its online program, TradeDesk? If not, please explain.

c. What are the specific rules and processes of compliance for participating TradeDesk users as it relates to ticket purchasing limits and other relevant consumer protection priorities? Please share any documents and guidance materials that are provided to TradeDesk users.

d. What role does Ticketmaster's Professional Reseller Handbook play in deterring its resellers from engaging in illegal ticket purchasing activities?

35.     By coordinating with professional reseller and leveraging its domination of the Relevant Markets, Ticketmaster: (1) suppresses and prevents competition from other participants in the secondary ticket marketplace; (2) artificially manipulates supply and demand; (3) leverages its position in the primary market to extend itself into the secondary ticket marketplace; and (4) increases the prices of tickets for consumers on a massive scale.

36.     This conduct unreasonably restrains trade in the market for tickets by artificially removing tickets from the primary market for sale at higher prices on the secondary market, thus denying consumers' access to tickets in the primary market and requiring their purchase at inflated prices in the secondary market.

37.     By engaging in this anticompetitive conduct, Ticketmaster has generated billions of dollars of revenue for itself at the expense of consumers. Ticketmaster protects this revenue and its anticompetitive position by selectively enforcing its prohibition on automated technologies and fake accounts against resellers who do not participate in its scheme and who sell tickets on secondary exchanges not controlled by Ticketmaster.

38.     Ticketmaster also uses its monopoly power in the primary ticket market to improperly exclude competition in the secondary market by entering onto contracts with ticket suppliers and venues that require purchasers in the primary market to use only Ticketmaster exchanges for resale.

39.     Plaintiff has been injured and has lost money and property as a result of Ticketmaster's practices, and brings his claim for public injunctive relief to prevent further harm to the public at large, which continues suffer harm as a result of Ticketmaster's widespread unlawful activity. Plaintiff seeks preliminary and permanent injunctions to prohibit the Ticketmaster's ongoing unlawful acts, which threaten future deception of, and injury to, the public.

40.     To the extent that Ticketmaster asserts that any waiver of class action claims and/or enforcement of arbitration clause(s) are applicable to the allegations contained in this Complaint, Plaintiff will show that such provisions should not be enforceable upon Plaintiff as a result of Ticketmaster's non-compliance with its own Terms of Use and/or are void as against public policy as a result of Ticketmaster's fraudulent and/or or deceptive business practices to the detriment of consumers and the public.

41.     Plaintiff's claims are timely and facts indicating that Ticketmaster was engaging in the misconduct alleged herein were actively concealed by Ticketmaster.

42.     Plaintiff, on behalf of herself and a nationwide Class, seeks restitution, attorneys' fees, and costs of suit.

## V.     RELEVANT MARKETS

43.     The following markets are relevant to this case:

a.  All tickets to concerts and other live events throughout the United States;

b.  The narrower market for the resale of those tickets throughout the United States.

44.     The markets for all tickets to concerts and other live events and the narrower market of all resale tickets are collectively referred to as the "Relevant Markets."

## VI.    CLASS ACTION ALLEGATIONS

45.     Under Rule 23 of the Federal Rules of Civil Procedure, plaintiff seeks certification of a class ("Class") defined as follows:

> All end-user purchasers in the United States who purchased tickets off a secondary ticket exchange wherein the tickets were first offered on Ticketmaster.com within the past three years from September 26, 2015 through September 26, 2018.

46.     Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also, excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

47.     <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of all members is unfeasible and not practicable.  The exact number of Class members is not known to Plaintiff at the present time.  However, based on the nature of the trade and commerce involved, there appear to be hundreds of thousands if not millions of Class members such that joinder of all Class members is impracticable.

48.     <u>Commonality</u>.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

a. Whether Defendants permitted, facilitated, incentivized and/or encouraged the violations of its policies to increase resales on its secondary exchange causing Plaintiff and the class to pay artificially inflated prices;

b. Whether such conduct violates the unlawful prong of section 17200;

c. Whether such conduct violates the unfair prong of section 17200;

d. Whether such conduct caused Defendants' unjust enrichment Class members' expense; and

e. Whether restitution and/or injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

49.     <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiff asserts claims that are typical of the Class.  Plaintiff and all Class members have been subjected to the same wrongful conduct because they all have purchased and paid more for Ticketmaster tickets on the secondary market after Ticketmaster secretly permitted, facilitated, and/or actively encouraged the violation of its policies and the sale of its tickets by scalpers on the secondary market using its TradeDesk platform.

50.     <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

51.     <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy

through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member. Furthermore, because the injury suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous. There will be no difficulty in the management of this action as a class action.

52.    <u>Injunctive and Declaratory Relief</u>. Fed. R. Civ. P. 23(b)(2). Defendant's misrepresentations are uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

53.    The Class is defined by objective criteria, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions, including use of Defendants' records of sale by third parties using its TradeDesk platform.

## FIRST CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code § 17200

54.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

55.    Plaintiff asserts this claim individually and on behalf of the nationwide Class.

56.    Application of California law is appropriate given Defendants' headquarters are in California and key decisions regarding the TradeDesk platform

and related business practices described herein were presumably developed at their in-state headquarters, such that the unfair business practices described herein emanated from California.

57.     Cal. Bus. & Prof. Code § 17200 prohibits unlawful and unfair business acts and practices.  Defendants have engaged in unlawful and unfair business acts and practices in violation of the UCL as a result of the wrongful conduct alleged herein.

58.     Defendants have violated the unlawful prong of section 17200, because the acts and practices set forth herein violate the *Better Online Ticket Sales (BOTS) Act of 2016,* 15 U.S.C.A. §45c.  The BOTS Act states in subsection (a) (1) that it shall be unlawful for any person:

> (A) to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or
>
> (B) to sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either--
>
> (i)     participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
>
> (ii)    knew or should have known that the event ticket was acquired in violation of subparagraph (A).

59.     The BOTS Act also states in subsection (b) that any "violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section18 (a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))."  For this reason, Defendants also violate the unfair prong of section 17200.

60.     Defendants have violated the unfair prong of section 17200, because the acts and practices set forth herein offend established public policies supporting honesty and fair dealing in consumer transactions, as well as the policy against the "circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event," as set forth in the BOTS Act.  Defendants' conduct as described herein is also unethical, oppressive, unscrupulous and injurious to consumers.  The harm that these acts and practices cause greatly outweighs any benefits associated with them.  And consumers could not have reasonably avoided the harm because they did not know that Ticketmaster permitted, facilitated, and/or encouraged professional resellers, or scalpers, to violate its policies and sell its tickets on Ticketmaster's secondary market.

61.     Plaintiff has suffered injury in fact, including loss of money, as a result of Defendants' unfair practices.  Plaintiff and members of the Class were directly and proximately injured by Defendants' conduct and lost money as a result of Defendants' conduct, because they paid more for Ticketmaster tickets on the secondary market and/or paid a cut that went to Ticketmaster after it secretly permitted, facilitated, incentivized and/or actively encouraged the sale of its tickets by professional resellers on the secondary market using its TradeDesk platform.

62.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California and the nation.

63.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair business practices, to restore to Plaintiff and members of the Class the money that Defendants acquired from them by this unfair competition, and to provide such other relief as set forth below.

64.     Plaintiff requests an award of attorneys' fees under Cal. Civ. Proc.

Code § 1021.5 for the benefit conferred upon the general public by any injunctive or other relief entered herein.

## SECOND CAUSE OF ACTION

**Violation of the California False Advertising Act**

**Business & Professions Code Section 17500,** *et seq.*

65.     Plaintiff re-alleges and incorporates by reference all paragraphs alleged herein.

66.     Plaintiff asserts this claim on behalf of herself and the nationwide Class.

67.     Through its marketing and advertising campaign, Defendants offered their services as both a primary ticket marketplace and secondary ticket marketplace platform for concerts and other live events throughout the United States, including California.

68.     Defendants engaged in unfair, deceptive, untrue or misleading advertising related to their services as a primary ticket marketplace and as a secondary ticket marketplace platform.

69.     Defendants disseminated or caused to be disseminated materially untrue and misleading advertising and/or marketing statements with the intent to either directly or indirectly induce members of the public, including Plaintiff and Class members, to purchase tickets to concerts and other live events through Ticketmaster's primary ticket marketplace and secondary ticket marketplace, including, but not limited to, the facts that it specifically prohibits re-sellers from purchasing tickets that exceed the posted ticket limit for an event and prohibits the creation of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale, when in fact Defendants engage in affirmative conduct to allow, facilitate, and encourage scalpers to violate these policies and prevent consumers from receiving the alleged benefits.

70.     Defendants disseminated or caused to be disseminated advertising

and/or marketing which omitted material information at the time of sale, including, but not limited to, the following:

    a. Defendants allow, facilitate, and encourage scalpers to purchase tickets that exceed the posted ticket limit for an event;

    b. Defendants allow, facilitate, and encourage scalpers to create fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale;

    c. Defendants created the a custom-designed and web-based, inventory management, sales and full point-of-sale system built expressly for professional resellers which allows scalpers to 'sync' hundreds of Ticketmaster.com accounts and instantly upload purchased event seats onto secondary ticket marketplace websites, including Ticketmaster's secondary ticket marketplace platforms;

    d. Defendants created an online tool that lets scalpers move any verified Ticketmaster ticket from one account to another in order to facilitate, and encourage scalpers to create fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale

    e. Defendants incentivized scalpers to purchase tickets in bulk through a series of rewards program with financial incentives;

    f. Defendants selectively enforced its rules and policies in an effort to control and manipulate the secondary ticket marketplace; and

    g. Defendants profited from both the primary ticket market sales and the secondary ticket marketplace Sales on its platforms.

    71.    The misrepresentations and concealed or undisclosed facts are material. A reasonable person would have considered them to be important in deciding whether to purchase tickets to concerts and other live events from Defendants.

    72.    When Defendants disseminated the misleading statements and material omissions described above, they knew, or by exercise of reasonable care

should have known, that their statements were untrue and misleading in violation of the Fair Advertising Law, California Business & Professional Code Section 17500 *et* seq.

73.   Plaintiff, on behalf of herself and all others similarly situated, demands judgment against Defendants for restitution, disgorgement, injunctive relief, relief, and all other relief afforded under Business &Professions Code section 17500, plus interest, attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### Per Se Violation of Section 1 of the Sherman Act

### 15 U.S.C. § 1

74.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

75.   As alleged herein, Ticketmaster by and through its officers, directors, employees, or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce and to affect the price of articles in trade, and acted in a combination of capital, skills, and/or acts to increase the price of merchandise, in violation of the Sherman Act, 15 U.S.C. § 1.

76.   Plaintiff and the members of the Class are proper entities to bring a case concerning this conduct.

77.   Ticketmaster's conduct as alleged herein unreasonably restrains trade and inflates prices in one or more of the relevant markets in violation of the Sherman Act.

78.   Defendants anticompetitive conduct includes, but is not limited to: (1) using monopoly power in the primary ticket market to improperly exclude competition in the secondary market by entering onto contracts with ticket suppliers and venues that require purchasers in the primary market to use only Ticketmaster exchanges for resale; and (2) selectively enforcing its prohibition on automated technologies and ficticious accounts against resellers who do not

participate in its scheme and who sell tickets on secondary exchanges not controlled by Ticketmaster.

79.    Plaintiff and the Class have suffered antitrust injury as a result of Ticketmaster's unlawful acts as herein alleged..

80.    Ticketmaster's activities as alleged herein are per se violations of the Sherman Act.

81.    Plaintiff seeks damages according to proof, which damages shall be automatically trebled pursuant to the Sherman Act.

82.    Plaintiff seeks an injunction against further wrongful acts of Defendants pursuant to the Sherman Act.

83.    Plaintiff is automatically entitled to reasonable attorney's fees pursuant to the Sherman Act.

84.    Plaintiff is automatically entitled to his costs of suit pursuant to the Sherman Act.

## **FOURTH CAUSE OF ACTION**

### **Violation of Section 1 of the Sherman Act Under the Rule of Reason**
### **15 U.S.C. § 1**

85.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

86.    As alleged herein, Ticketmaster by and through its officers, directors, employees, or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce and to affect the price of articles in trade, and acted in a combination of capital, skills, and/or acts to increase the price of merchandise, in violation of the Sherman Act, 15 U.S.C. § 1.

87.    Plaintiff and the members of the Class are proper entities to bring a case concerning this conduct.

88.    Ticketmaster's conduct as alleged herein unreasonably restrains trade and inflates prices in one or more of the relevant markets in violation of the

Sherman Act.

89.     Defendants anticompetitive conduct includes, but is not limited to: (1) using monopoly power in the primary ticket market to improperly exclude competition in the secondary market by entering onto contracts with ticket suppliers and venues that require purchasers in the primary market to use only Ticketmaster exchanges for resale; and (2) selectively enforcing its prohibition on automated technologies and fake accounts against resellers who do not participate in its scheme and who sell tickets on secondary exchanges not controlled by Ticketmaster.

90.     Plaintiff and the Class have suffered antitrust injury as a result of Ticketmaster's unlawful acts as herein alleged.

91.     Ticketmaster's activities as alleged herein are violations of the Sherman Act, under the rule of reason.

92.     Plaintiff seeks damages according to proof, which damages shall be automatically trebled pursuant to the Sherman Act.

93.     Plaintiff seeks an injunction against further wrongful acts of Defendants pursuant to the Sherman Act.

94.     Plaintiff is automatically entitled to reasonable attorney's fees pursuant to the Sherman Act.

95.     Plaintiff is automatically entitled to his costs of suit pursuant to the Sherman Act.

## FIFTH CAUSE OF ACTION

### Violation of Section 2 of the Sherman Act: Unlawful Monopolization

### 15 U.S.C. § 2

96.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

97.     Through the conduct described herein, Ticketmaster has willfully acquired and maintained monopoly power in the Relevant Markets.

98.    Defendants' conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

99.    For the purpose of maintaining its monopoly power, Defendants committed numerous acts, including, but not limited to:

> a.   Using its monopoly power in the Relevant Markets to exclude competition in the secondary market by entering onto contracts with ticket suppliers and venues that require purchasers in the primary market to use only Ticketmaster exchanges for resale; and
>
> b.   Selectively enforcing its prohibition on automated technologies and fictitious accounts against resellers who do not participate in its scheme and who sell tickets on secondary exchanges not controlled by Ticketmaster.

100.    Defendants have excluded competitors from the Relevant Markets and have deprived consumers of the benefits of competition among suppliers of tickets to concerts and other live events.

101.    Defendants do not have a legitimate business purpose for any of its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.

102.    Defendants' conduct does not result in any greater ability to reduce costs to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Defendants' conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets. The only "benefit" that flows from Defendants' conduct is a reduction in competition, and that benefit inures only to Defendants' advantage, not to that of customers or competition on the merits.

103.   Defendants' unlawful monopolization has injured competition in the Relevant Markets, suppressed sales of its competitors.

104.   Defendants' overall course of conduct has and will continue to, inter alia, maintain supra-competitive prices to customers in the Relevant Markets.

## SIXTH CAUSE OF ACTION

### Violation of Section 2 of the Sherman Act: Attempted Monopolization
### 16 U.S.C. § 2

105.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

106.   Through the conduct described herein, Ticketmaster has willfully attempted to acquire and maintain monopoly power in the Relevant Markets.

107.   Defendants' conduct constitutes the intentional and unlawful attempt to secured and maintain monopoly power in the Relevant Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

108.   For the purpose of maintaining its monopoly power, Defendants committed numerous acts, including, but not limited to:

    a.   Using its monopoly power in the primary ticket market to exclude competition in the secondary market by entering onto contracts with ticket suppliers and venues that require purchasers in the primary market to use only Ticketmaster exchanges for resale; and

    b.   Selectively enforcing its prohibition on automated technologies and fictitious accounts against resellers who do not participate in its scheme and who sell tickets on secondary exchanges not controlled by Ticketmaster.

109.   Defendants have attempted to exclude competitors from the Relevant Markets and have tried to deprive consumers of the benefits of competition among suppliers of tickets to concerts and other live events.

110.   Defendants do not have a legitimate business purpose for any of its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light

of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.

111.   Defendants' conduct does not result in any greater ability to reduce costs to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Defendants' conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets. The only "benefit" that flows from Defendants' conduct is a reduction in competition, and that benefit inures only to Defendants' advantage, not to that of customers or competition on the merits.

112.   Throughout the time Defendants engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Markets and excluding its competitors.

113.   Defendants' unlawful attempts to destroy competition in the Relevant Markets, suppressed sales of its competitors.

114.   Defendants' overall course of conduct has and will continue to, inter alia, maintain supra-competitive prices to customers in each of the Relevant Markets.

### SEVENTH CAUSE OF ACTION

#### Per Se Violation of the Cartwright Act

#### California Business & Professions Code § 16720

115.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

116.   As alleged herein, Ticketmaster by and through its officers, directors, employees, agents, or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce and to affect the price of articles in trade, and acted in a combination of capital, skills, and/ or acts to increase the price of merchandise, in violation of the Cartwright Act, California Business and Professions Code§ 16720.

117.   Plaintiff and the members of the Class are proper entities to bring a case concerning this conduct.

118.   Ticketmaster's activities as alleged herein are per se violations of the Cartwright Act, California Business and Professions Code§ 16720.

119.   Plaintiff and the Class have suffered antitrust injury and have been injured in their business and property as a result of Ticketmaster's unlawful acts as herein alleged.

120.   Plaintiff seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

121.   Plaintiff seeks an injunction against further wrongful acts of Ticketmaster pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

122.   Plaintiff is automatically entitled to reasonable attorney's fees pursuant to the Cartwright Act, California Business and Professions Code§ 16750(a).

123.   Plaintiff is automatically entitled to his costs of suit pursuant to the Cartwright Act, California Business and Professions Code§ 16750(a).

## EIGHTH CAUSE OF ACTION
### Violation of the Cartwright Act Under the Rule of Reason
### California Business & Professions Code § 16720

124.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

125.   As alleged herein, Ticketmaster by and through its officers, directors, employees, agents, or representatives, entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade and commerce and to affect the price of articles in trade, and acted in a combination of capital, skills, and/or acts to increase the price of merchandise, in violation of the Cartwright Act,

California Business and Professions Code§ 16720.

126.   Plaintiff and the members of the Class are proper entities to bring a case concerning this conduct.

127.   Ticketmaster's conduct as alleged herein unreasonably restrains trade and inflates prices in one or more of the relevant markets in violation of the Cartwright Act, California Business and Professions Code§ 16720.

128.   Plaintiff and the Class have suffered antitrust injury as a result of Ticketmaster's unlawful acts as herein alleged.

129.   Plaintiff seeks damages according to proof, which damages shall be automatically trebled pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

130.   Plaintiff seeks an injunction against further wrongful acts of Ticketmaster pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

131.   Plaintiff is automatically entitled to reasonable attorney's fees pursuant to the Cartwright Act, California Business and Professions Code§ 16750(a).

132.   Plaintiff is automatically entitled to his costs of suit pursuant to the Cartwright Act, California Business and Professions Code § 16750(a).

### NINTH CAUSE OF ACTION

**Violation of the California Consumer Legal Remedies Act**

**California Civil Code Section 1750, *et seq.***

133.   Plaintiff alleges and incorporates by reference all paragraphs alleged herein.

134.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Class members.

135.   Plaintiff has standing to pursue this claim because she suffered injury in fact and lost money as a result of Defendants' actions.   Specifically, Plaintiff

paid for live events ticket(s) for her own personal use.  In doing so, she believed and relied upon the statements made by Defendants, including statements that Defendants specifically prohibits re-sellers from purchasing tickets that exceed the posted ticket limit for an event and prohibits the creation of fictitious user accounts for the purpose of circumventing ticket limit detection in order to amass tickets intended for resale.

136.   The California Consumer Legal Remedies Act ("CLRA") has adopted a comprehensive statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property, or services to consumers primarily for personal, family, or household purposes.

137.   Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in a transaction with Plaintiff that resulted in the sale of tickets to Plaintiff and Plaintiff was harmed by Defendants' conduct.

138.   The transaction, policies, acts and practices engaged in by Defendants and alleged herein were intended to and did result in the sale of tickets to Plaintiff and Class members and violated the CLRA.

139.   Defendants engaged in deceptive practices, in violation of CLRA, that were designed to induce Plaintiff and Class members to purchase the tickets to concerts and other live events.

140.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business.

141.   In engaging in the foregoing unfair or deceptive conduct, Defendant misrepresented, concealed or failed to disclose to Plaintiff and Class members material facts about the tickets purchased that a reasonable person would have considered important in deciding whether to purchase or pay less for the tickets.

142.   Plaintiff and class members suffered injury in fact and/or actual damages as a direct result of Defendants' misleading marketing campaign and/or concealment of material facts in violation of the CLRA.

143.     To this day, Defendants continue to violate the CLRA by making misrepresentations and concealing material facts relating to the tickets and both the primary ticket exchange and secondary ticket exchange.

144.     As a result of the foregoing, Plaintiff and class members have had their legal rights infringed upon and have suffered irreparable harm, entitling them to injunctive relief.

145.     Plaintiff seeks injunctive relief only for this violation of the CLRA, but reserves it right to amend this complaint to include allegations for the recovery of damages under the CLRA.

146.     Plaintiff has made a demand in satisfaction of California Civil Code Section 1750, *et seq.* and may amend this Complaint to assert claims under the CLRA once the required notice period has elapsed.

147.     In compliance with Cal. Civ. Code 1782(d), Plaintiff has executed the affidavit of venue attached hereto and filed concurrently herewith.

## TENTH CAUSE OF ACTION

### Violation of Common Law of Unjust Enrichment

148.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

149.     Plaintiff asserts this claim on behalf of herself and the nationwide Class.

150.     Application of California law is appropriate given Defendants' headquarters are in California and key decisions regarding the TradeDesk platform and related business practices described herein were presumably developed at their in-state headquarters, such that the wrongful conduct described herein emanated from California.

151.     As alleged herein, fewer tickets are available on the primary ticket market because of Defendants' conduct, including, but not limited to: (1) allowing scalpers to purchase tickets in bulk and/or in violation of Ticketmaster policies

from Ticketmaster's primary market; (2) facilitating the scalpers' schemes by creating systems like TradeDesk and Event Inventory; and (3) encouraging scalpers to do so with professional resale rewards programs.

152.    Tickets are typically sold on the secondary market at a significant price increase over the price on the primary ticket market.  Consumers purchasing on the secondary ticket marketplace pay the face value of the ticket, plus all Ticketmaster's original fees, plus the professional resellers profit margin, plus all the additional fees charged by Defendants on Ticketmaster's secondary ticket marketplace.

153.    Defendants have benefitted and been enriched by their wrongful conduct.  To the detriment of plaintiff and Class members, Defendants have and continue to be unjustly enriched as a result of the wrongful conduct alleged herein.  Between the parties, it would be unjust for Defendants to retain the benefits attained by its wrongful actions.

154.    Defendants have generated substantial revenue from the inequitable conduct described herein.  Defendants have knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.  Defendants have voluntarily accepted and retained this benefit.

155.    Defendants should return to Plaintiff and Class members these ill-gotten gains resulting from their wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against defendant and in favor of plaintiff and Class members, and grant the following relief:

a.  Determine that this action may be maintained as a class action with

respect to the Class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiff as Class representative and her counsel as Class counsel;

b.  Declare, adjudge, and decree the conduct of Defendants as alleged herein to be in violation of Cal. Bus. & Prof. Code § 17200 and the common law of unjust enrichment;

c.  Enjoin Defendants from continuing their unlawful conduct;

d.  Award Plaintiff and the Class restitution of all monies paid to Defendants as a result of their unlawful conduct;

e.  Award plaintiff and the Class reasonable attorneys' fees and costs; and

f.  Award Plaintiff and the Class such other further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

### **JURY TRIAL DEMAND**

Plaintiff, by counsel, requests a trial by jury for all claims so triable.

Date: October 19, 2018

AHDOOT & WOLFSON, PC

s/ Alex R. Straus
Alex R. Straus
astraus@ahdootwolfson.com
Tina Wolfson
twolfson@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111; Fax: (310) 474-8585