UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-9052-GW(GJSx) | | Date | March 11, 2019 |
|---|---|---|---|---|
| Title | *Austin Dickey v. Ticketmaster LLC, et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | Katie E. Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Tina Wolfson | Timothy L. O'Mara |
| Alex R. Straus | Alicia R. Jovais |

**PROCEEDINGS:** DEFENDANTS' MOTION TO COMPEL ARBITRATION [20]

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' Motion is TAKEN UNDER SUBMISSION. Court to issue ruling.

: 30

Initials of Preparer  JG

***Dickey v. Ticketmaster***; Case No. 2:18-cv-09052-GW-(GJSx)
Tentative Ruling on Defendants' Motion to Compel Arbitration

I. <u>Background</u>

    **A. Factual Background**

Austin Dickey ("Plaintiff") sues Ticketmaster, LLC ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation") (collectively "Defendants") for: (1) violation of California Business & Professions Code § 17200; (2) violation of the California False Advertising Act, California Business & Prof. Code § 17500 *et seq.*; (3) per se violation of the Sherman Act, 15 U.S.C. § 1; (4) violation of the Sherman Act, 15 U.S.C. § 1 under the Rule of Reason; (5) violation of the Sherman Act: Unlawful Monopolization, 15 U.S.C. § 2; (6) violation of the Sherman Act: Attempted Monopolization, 16 U.S.C. § 2; (7) per se violation of the Cartwright Act, California Business & Professions Code § 16720; (8) violation of the Cartwright Act under the Rule of Reason, California Business & Professions Code § 16720; (9) violation of the California Consumer Legal Remedies Act California Civil Code § 1750, *et seq.*; and (10) violation of common law unjust enrichment. *See generally* Complaint, Docket No.1. Plaintiff alleges the following relevant facts:

Plaintiff purchased tickets, originally sold by Ticketmaster, on the secondary market at www.ticketmaster.com/verified. *See id.* ¶ 8. Plaintiff seeks certification of a class ("Class") defined as follows: all end-user purchasers in the United States who purchased tickets off a secondary ticket exchange wherein the tickets were first offered on www.ticketmaster.com within the past three years from September 26, 2015 through September 26, 2018. *See id.* ¶ 45.

Ticketmaster is a subsidiary wholly owned by Live Nation. *See id.* ¶ 1. Ticketmaster's business model is premised on fees charged for each ticket sold, including: (1) a facility charge; (2) a convenience charge; (3) an order processing fee; (4) a ticket printing fee; and (5) a faculty fee. *See id.* ¶ 2. In total, the additional fees charged by Ticketmaster are typically $17.30 on a $30 ticket, constituting a 57% increase on the price of every ticket. *See id.* Ticketmaster also takes a percentage of the original face value price from the artists for its services. *See id.* ¶ 5.

Ticketmaster provides a platform to sell tickets to the public at face value, plus its various fees and charges ("primary ticket marketplace"). *See id.* ¶ 4. Ticketmaster also provides platforms for those tickets to be resold, with additional fees and charges, in what Ticketmaster describes as

fan-to-fan transactions ("secondary ticket marketplace"). *See id.* Ticketmaster operates at least three secondary ticket marketplace platforms: (1) www.ticketmaster .com/verified; (2) www.ticketexchangebyticketmaster.com; and (3) www.ticketsnow.com. *See id.* ¶ 16.

In September 2018, the Toronto Star published an exposé accusing Ticketmaster of intentionally undermining its own business purpose to reap profits by reselling the same tickets on its secondary ticket market. *See id.* ¶ 7. Ticketmaster more than doubles its profits if the same ticket can be sold twice; once from its primary ticket marketplace with an estimated 57% markup in fees, and again from its secondary ticket marketplace where the markup is often higher. *See id.* ¶ 18. For many events, Ticketmaster's terms of purchase limit resale to Ticketmaster's own resale exchanges. *See id.* ¶ 19

Ticketmaster's primary ticket marketplace explicitly represents to its customers and the public that it: (1) prohibits re-sellers from purchasing tickets that exceed the posted ticket limit for an event and (2) prohibits the creation of fictitious user accounts to circumvent ticket limit detection and amass tickets intended for resale. *See id.* ¶ 20. According to a recent Toronto Star and Canadian Broadcasting Corporation investigation, Ticketmaster aided resellers in engaging in these prohibited acts. *See id.* ¶ 21.

Ticketmaster created a web-based inventory management and point-of-sale system called TradeDesk. *See id.* ¶ 22. TradeDesk was built for professional resellers and allows scalpers to sync hundreds of www.ticketmaster.com accounts and instantly upload purchased event tickets onto secondary ticket marketplace websites. *See id.* TradeDesk gives preferential treatment to professional resellers who sell tickets on one of Ticketmaster's secondary ticket marketplace platforms. *See id.* A feature of TradeDesk called Transfer allows resellers to move any verified Ticketmaster ticket from one account to another. *See id.* ¶ 23. On October 21, 2018, US Senators Jerry Moran and Richard Blumenthal sent a letter to Live Nation's CEO which stated that TradeDesk users move up to several million tickets per year. *See id.* ¶¶ 32-33. The Senators requested responses to a set of questions from Ticketmaster due to their concern that Ticketmaster may have violated the Better Online Ticket Sales Act of 2016. *See id.* ¶ 34.

Ticketmaster incentivizes resellers to purchase tickets in bulk through a series of rewards programs with financial incentives, such as a reduction in resell fees for $500,000 or $1 million in annual sales. *See id.* ¶ 28. There are also bonuses for resellers who increase year-to-year sales, and other financial incentives. *See id.*

Representatives of Ticketmaster admitted to knowing that scalpers have a couple hundred accounts that they use to buy tickets in bulk. *See id.* ¶ 29. They also stated that Ticketmaster was not concerned if professional resellers used automated software and fake identities to circumvent the ticket-buying limits. *See id.* The representatives stated that Ticketmaster does not monitor or police users of its TradeDesk platform to prevent conduct in violation of Ticketmaster policies. *See id.* ¶ 30. They further admitted that Ticketmaster's primary and secondary ticket marketplace platforms do not communicate regarding abuses of Ticketmaster's primary ticket market platform. *See id.* Ticketmaster expedites the issuance of final tickets with bar codes when tickets purchased on its primary ticket marketplace are offered for resale on its secondary ticket marketplace. *See id.* ¶ 25. Ticketmaster offers a significantly slower process when tickets are offered for resale on any other secondary ticket exchange platform. *See id.* Ticketmaster selectively asserts legal and contractual rights and claims against resellers who not use Ticketmaster's reselling platforms. *See id.* ¶ 26. Ticketmaster's overwhelmingly dominant market share of the primary ticket exchange means that a sanction or banishment from Ticketmaster is disastrous for any professional reseller. *See id.* ¶ 27.

### B. Procedural Background

Before the Court is Defendants' motion to compel the arbitration of Plaintiff's claims. *See* Motion to Compel Arbitration ("MTC"), Docket No. 20. Plaintiff filed an opposition to the MTC. *See* Plaintiff's Opposition to Defendants' Motion to Compel Arbitration ("Opp'n"), Docket No. 24. Defendants filed a reply in support of the MTC. *See* Defendants' Reply in Support of Motion to Compel Arbitration ("Reply"), Docket No. 29.

## II. Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the Act is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and,

3

if it does, (2) whether the agreement encompasses the dispute at issue.  If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)).

On a motion to compel arbitration, courts apply a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)).  Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (internal quotation marks omitted).

Similarly, at the summary judgment stage courts do not "focus on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser*, 342 F.3d at 1036. Objections on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate. *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they are capable of being reduced to admissible evidence at trial."); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if a declaration violated best evidence rule, court was not precluded from considering the declaration in awarding summary judgment).

### III. <u>Analysis</u>

    **A. Whether Plaintiff Assented to the Ticketmaster TOU Bearing an Arbitration and Delegation Provision**

        *1. The Law Governing Internet Agreements Bearing on Arbitration*

4

"To evaluate the validity of an arbitration agreement, federal courts [ ] apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). Ordinarily, district courts decide whether an arbitration agreement is enforceable pursuant to the law of the state in which the contract was formed. *Id.* With the parties all applying California law in briefing, the Court will apply California law on the question of arbitration.

In the fairly recent past, the Ninth Circuit noted that "[c]ontracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

As to browsewrap agreements, they do not "require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." *Id.* (internal quotation marks and citation omitted). "Indeed, 'in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service.' " *Id.* (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012)). "Thus, 'by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink.'" *Id.* Courts have held that the "validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* (citing cases). Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of services. *See e.g.*, *Riensche v. Cingular Wireless, LLC*, C06–1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v. Google*, Civil Action No. 06–2540, 2007 WL 966011, at *5-8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract). Courts have also found constructive notice where sites contain a disclosure statement that indicates if a user signs up for

a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook*, *Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign-up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[1]

As to clickwrap and sign-in-wrap agreements, some courts have refused to enforce those agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice. *See, e.g.*, *Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *see also Sprecht v. Netscape Communications Corp.*, 306 F.3d 17, 22-23 (2d Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign-up process).

While courts addressing constructive notice in internet commerce have avoided

---

[1] *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:

> Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

97 F. Supp. 3d at 394-95.

establishing hard and fast rules, review of the case law at the district level provides important guidance. Again, *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [Internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).
>
> Second, "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage. *See, e.g.*, *Ticketmaster Corp.*, 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the "terms of use" "could not be missed"); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).
>
> Third, "terms of use" will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen − an action that was not required to effectuate her purchase").

97 F. Supp. 3d at 401-02.

   *2. Whether Plaintiff Assented to the TOU and Arbitration Provision Under the Facts of This Case*

Now, the Court will turn to the facts of this case, including the website designs Plaintiff faced at various points. Defendants argue that Plaintiff assented to Ticketmaster's Terms of Use ("TOU") on multiple occasions: (1) when she initially created an account on www.ticketmaster.com ("Website"), (2) when she used the Website to purchase tickets and browsed that site to select her tickets, (3) when she signed in to purchase those tickets, and (4)

7

when she ultimately finalized the purchase of those tickets.  *See* MTC at 3-6, 8-11.

For Plaintiff to create her account at ticketmaster.com, she had to enter her personal information, create a password, and then click a button labeled "Sign Up."  *See* Declaration of Kimberly Tobias ("Tobias Decl.") ¶ 6, Docket No. 21; *see id.* Ex. A, Docket No. 21-1.  Directly above the "Sign Up" button, the following language ("Disclosure") exists in a legible font size: "By submitting, you agree to our "Terms and Purchase Policy, and understand your information will be used as described in our Privacy Policy.  *See id.*  The phrases "Terms," "Purchase Policy," and "Privacy Policy" are all hyperlinked in blue font, with the other language in a dark gray font.  In terms of font size, the Disclosure is slightly smaller than the "Sign Up" button, but not my much and it is more than legible.  *See id.*  Hereinafter, the Court refers to the screen Plaintiff faced when signing up as the "Sign Up Screen."

Then, for Plaintiff to purchase the tickets at issue (which she did on a different day than signing up), Plaintiff had to sign into her account.   To sign in, she had to input her user credential and click a "Sign In" button, with a "Forgot Password?" line below it, then a line stating "New to Ticketmaster? Sign Up" below that, and then finally a line stating in slightly smaller font than the Sign In button "By continuing past this page, you agree to our Terms of Use."  *See* Tobias Decl. ¶¶ 12-13; *see id.* Ex. F, Docket No. 21-6.  The Court will hereinafter refer to that screen as the "Sign In Screen."

After that point, Plaintiff was required to fill out payment and billing information on yet another screen.  *See* Tobias Decl. ¶ 15; *see id.* Ex. H, Docket No. 21-8.  There, she faced a "Place Order" button with a line directly above it stating "[b]y clicking 'Place Order,' you agree to our Terms of Use."  *See id.*  The "Terms of Use" was a blue hyperlink to the respective document with the rest of the language above the button in a dark gray.  *See id.*  The Court refers to this screen as the "Place Order Screen."  Collectively, the Court refers to Sign Up Screen, Sign In Screen, and Place Order Screen as the "Relevant Screens."[2]

At least three other district courts have found that users assented to Ticketmaster's terms and conditions when faced with a website design substantially similar to at least one of the

---

[2] With the Court finding at least one of the Relevant Screens bound Plaintiff to the Ticketmaster TOU for reasons discussed below, the Court need not address the weakest of Defendant's arguments (that Plaintiff assented when simply browsing the Website to purchase tickets).  Indeed, Defendant concedes that it is "not relying on the passive browsewrap agreement to establish Plaintiff's assent to the Terms, because Plaintiff *affirmatively* assented to the Terms on multiple occasions: when she created her account, signed into her account, *and* purchased the tickets at issue.").  *See* Reply at 2.

Relevant Screens. *See Nevarez v. Forty Niners Football Co., LLC*, No. 16-CV-07013, 2017 WL 3492110, at *9 (N.D. Cal. Aug. 15, 2017) (concluding that "Plaintiffs accepted the [Ticketmaster] TOU when Plaintiffs made their ticket and parking pass purchases on the Ticketmaster Website in 2015 and 2016, and thus Plaintiffs assented to the arbitration provision contained within the Ticketmaster Website's TOU."); *see also Goza v. Multi-Purpose Civic Ctr. Facilities Bd. For Pulaski Cty.*, 2014 WL 3672128, at *3 (W.D. Ark. July 23, 2014) (holding that the user assented to the Ticketmaster Website's Terms of Use by registering an account and purchasing tickets); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 237 (S.D.N.Y. 2007) (holding that "Ticketmaster's Terms of Use are sufficiently conspicuous to be binding on the plaintiff as a matter of law."). As in *Nevarez*, the Court here would conclude that none of the Relevant Screens constitute a straightforward "browsewrap" agreement, while they are also not "pure-form clickwrap agreement[s]." *See Nevarez*, 2017 WL3492110, at *8. In a "pure-form clickwrap agreement . . . users typically click an 'I agree' box after *being presented with* a list of terms and conditions of use." *Fteja*, 841 F. Supp. 2d at 836-37. In this case, "[w]hile the Terms of Use require the user to click on ['Sign Up,' 'Sign In,' or 'Place Order'] to assent, they do not contain any mechanism that forces the user to actually examine the terms before assenting." *Id.* Users need not click an expressly labeled "I agree" button to assent to the Ticketmaster TOU. Instead, users have to click buttons labeled with other actions like "Sign Up," with the buttons themselves not mentioning the Ticketmaster TOU. In that vein, the Ticketmaster TOU is not a pure clickwrap agreement, in which website users "are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Id.* Instead, the Court would consider the TOU at issue to be "somewhat like a browsewrap agreement in that the [TOU] are only visible via a hyperlink" provided near the action buttons they ultimately press. *Id.* at 838. But, the Relevant Screens are "also somewhat like [] clickwrap agreement[s] in that the user must do something else" beyond browsing the website "to assent to the hyperlinked terms." *Id.* To sign up, sign in, or finalize an order, Plaintiff had to click "Sign Up," "Sign In," or "Place Order." *See* Tobias Decl. ¶¶ 6, 15; *see id.* Exs. A, F, H.

   Whatever the label, the Court would conclude that Plaintiff assented to the TOU at the very least when facing the Sign Up Screen and clicking the "Sign Up" button. To reiterate, with regard to the Sign Up Screen, the Disclosure above it states: "[b]y submitting, you agree to our Terms and Purchase Policy, and understand your information will be used as described in our Privacy

9

Policy."[3]  In deciding that Plaintiff assented to the TOU by clicking "Sign Up" on the Sign Up Screen, the Court finds persuasive the following undisputed facts: (1) it is undisputed that Plaintiff faced the Sign Up Screen and clicked the relevant button; (2) the Disclosure above the Sign Up button explicitly indicated that by submitting − *i.e.* by clicking the button directly below the Disclosure − Plaintiff accepted the TOU; (3) the Disclosure was *immediately* above the Sign Up Button and thus well-placed in terms of the action button taken to manifest acceptance with the TOU; (4) that the TOU was *hyperlinked* in the Disclosure and thus easily available in the well-placed Disclosure; (5) that the TOU hyperlink was in blue font to indicate as much and draw attention to it; (6) that the dark gray and blue font of the Disclosure above the Sign Up button contrasted with the white background; (7) and that the font size of the Disclosure was only slightly smaller than the Sign Up button but certainly legible and sufficiently significant in size.[4]

In this Circuit, courts have "consistently enforced" arbitration clauses contained within terms of use when users faced similar designs to the Sign Up Screen.  *See, e.g.*, *Nevarez*, 2017 WL 3492110, at *8 (holding that "[i]n any event, regardless of whether the Ticketmaster Website's TOU are most appropriately labeled as a 'browsewrap' or a 'clickwrap' agreement, the Court finds that Plaintiffs assented to the Ticketmaster Website's TOU in purchasing their tickets and parking passes on the Ticketmaster Website."); *Rodriguez v. Experian Serv. Corp.*, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015) (finding assent to an arbitration clause in a terms of use when the "Website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgement, which stated 'By clicking the button above . . . you agree to our Terms of Use,' " which were hyperlinked); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (finding assent to arbitration clause in terms of use where "all users of the Match.com website during the relevant time period were required to affirmatively

---

[3] The Sign Up Screen appears in part as follows:



*See* Tobias Decl. ¶ 6; *see id.* Ex. A.

[4] In coming to this conclusion, the Court does not rely on any assertion of the hyperlink's boldness, which Plaintiff disputes.  *See* Opp'n at 14.

agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review"). The Court would find that the Sign Up Screen presents a substantially similar situation to those cases, and based on the Court's independent review of all the relevant evidence and applicable standard, it would hold that Plaintiff assented to the TOU by clicking the Sign Up button on the Sign Up Screen; a reasonable user would have had constructive notice that doing so would bind him or her to the TOU.[5]

### B. Delegating Questions of Arbitrability

With the Court finding that Plaintiffs assented to Ticketmaster's TOU, the Court must decide whether the Court or the arbitrator should determine threshold questions of arbitrability. Defendants argue that the arbitrator must decide threshold questions of arbitrability because Plaintiff delegated that authority to the arbitrator. *See* MTC at 12-15. In response, Plaintiff briefly argues that the Court must decide arbitrability in this lawsuit. *See* Opp'n at 20-21. Plaintiff also argues that the delegation clause is rendered uncertain by the conditional license carve-out and that it is procedurally unconscionable. *See id.*

"A court is normally tasked with two gateway issues when deciding whether to compel arbitration under the FAA: '(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue.' " *Morgan v. Glob. Payments Check Servs., Inc.*, No. 2:17-CV-01771-JAM-CMK, 2018 WL 934579, at *2 (E.D. Cal. Feb. 15, 2018) (quoting *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "But the parties can agree to expressly delegate these gateway issues to an arbitrator, in which case an arbitrator, rather than a court, must decide the issues." *Id.* A court must determine whether the underlying agreement "clearly and unmistakably" delegated the questions of arbitrability to the arbitrator. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (internal quotation marks and citations omitted). Recently, the Supreme Court reiterated these points. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (explaining that the "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway'

---

[5] Because the Court would find mutual assent through the Sign Up Screen, the Court need not reach the question of whether Plaintiff assented when clicking the applicable buttons on the Sign In Screen or the Place Order Screen. Similarly, with it being undisputed that Plaintiff registered her account on a different day than she purchased tickets, there is no "duress" argument at play vis-à-vis the purchase countdown.

11

questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."). The Supreme Court has emphasized that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *See id.*

In the TOU at issue, the arbitration clause provides that "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to any claim that all or part of this Agreement is void or voidable." *See* Tobias Decl. Ex. L (current TOU), Docket No. 21-12; *see id.* Exs. M-P (prior versions of the TOU, containing substantially identical language), Docket Nos. 21-13 through 21-16). This language, as drafted, meets the requisite "clear and unmistakable" standard, and the Court therefore may not override the parties' choice to delegate questions of arbitrability to the arbitrator. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (holding that an arbitration clause providing that "arbitrators [had] the authority to decide issues relating to the 'enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision'. . . 'clearly and unmistakably indicates [the parties'] intent for the arbitrators to decide the threshold question of arbitrability.'"); *Tuminello v. Richards*, 504 F. App'x 557, 558 (9th Cir. 2013) (similarly holding that an arbitration clause that provided the arbitrator "shall decide 'any and all controversies . . . concerning any account(s), transaction, dispute or the construction, performance, or breach of this or any other Agreement' . . . provides clear and unmistakable evidence that the parties intended the question of arbitrability to be decided in arbitration."); *Chung v. Nemer*, No. C 12-4608, 2012 WL 5289414, at *1 (N.D. Cal. Oct. 25, 2012) (holding "that the arbitration agreement was clear in stating that '[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement,'" and therefore "plaintiff clearly and unmistakably agreed to arbitrate all disputes related to the agreement.").

The Court would reject Plaintiff's argument that the delegation clause is "rendered

uncertain" by the conditional license carve-out.[6] *See* Opp'n at 20-21. The conditional carveout provides that if a claim involves a conditional license, it may be filed in state or federal court as opposed to arbitration. *See* Tobias Decl. Ex. L, Docket No.21-2 at CM/ECF pg. 6.[7] Clearly, Plaintiff labels this argument as applicable to the delegation provision when it really is an argument against the arbitration provision and TOU as a whole rather than against the delegation clause specifically. For that reason, the Court would reject it. But even looking at the merits of the argument, the Court would disagree with Plaintiff. Indeed, Plaintiff fails to cite any case on any level where a court found a similar carve-out made a delegation provision unclear or somehow uncertain. Here, the carve-out at issue is not completely one-sided and instead applies to Ticketmaster's claims against a user *and* to a user's claims against Ticketmaster. *See* Tobias Decl. Ex. L (stating that "either of us may file a lawsuit in a federal or state court . . . ."). To the extent this is a substantive unconscionability argument, the Ninth Circuit has enforced arbitration clauses with carve-outs such as this one for intellectual property related claims, despite the fact it may be more likely that the company would bring this type of claim than the user would. *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1030-31 (9th Cir. 2016) (enforcing arbitration clause with a carve-out for "disputes relating to intellectual property rights, obligations, or any infringement claims," holding that "[u]nder [California] precedent, the provision in the Terms of Service in this case excluding intellectual property claims from mandatory arbitration is not unconscionable."); *see also Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 916-17 (2015) (arguably one-sided clause in arbitration agreement not unconscionable where it provided "the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need."). The carve-out, in the Court's view, does not render the delegation provision substantively unconscionable nor does it make the delegation provision something other than clear and unmistakable.

As to Plaintiff's assertion that the delegation clause is procedurally unconscionable, that argument does not suffice because in California a court can only find an agreement unconscionable

---

[6] With respect to the carve-out argument and the delegation clause specifically, Plaintiff does not use the term "substantive unconscionability at any point." *See* Opp'n at 20-21.

[7] More specifically, the carve-out provides as follows: "if a claim involves the conditional license granted to you as described in the Ownership of Content and Grant of Conditional License section above, either of us may file a lawsuit in a federal or state court located within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes . . . ." *See* Tobias Decl. Ex. L, Docket No. 21-2 at CM/ECF pg. 6.

13

if it is both procedurally *and* substantively unconscionable. *Goff v. G2 Secure Staff LLC*, No. CV 12-10008-CAS-(VBKx), 2013 WL 1773968, at *7 (C.D. Cal. Apr. 22, 2013) ("Accordingly, the Arbitration Agreement is not substantively unconscionable, and because both substantive and procedural unconscionability are required, the Court finds that the Arbitration Agreement is not unconscionable."); *see also Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 814 (2012) (to demonstrate that a contract is unconscionable, a party must establish both substantive and procedural unconscionability) (citing *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 113-114 (2000)).  With Plaintiff failing to demonstrate that the delegation is both procedurally *and* substantively unconscionable, the Court would reject Plaintiff's procedural unconscionability argument regarding the delegation provision.

### IV.  Conclusion

For the foregoing reasons, the Court would **GRANT** the MTC and compel Plaintiff to arbitration and dismiss her claims against Defendants.  Defendants prefer that the Court compel Plaintiff to arbitrate and thereby dismiss her claim.  *See* MTC at 15.  Plaintiff does not appear to respond to Defendants' request to dismiss rather than stay the claims pending arbitration, nor has she separately applied for a stay under 9 U.S.C. §3.[8]  *See generally* Opp'n.  Thus, the Court would deem dismissal appropriate given Plaintiff's lack of opposition on that point.

---

[8] An order granting a motion to compel arbitration and dismissing the case is immediately appealable; whereas granting that motion but staying the litigation pending the completion of the arbitration would not be immediately appealable.  *See Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79, 86-87 (2000).